Herman D. KENIN, as President of American Federation of Musicians of the United States and Canada, AFL–CIO, Plaintiff,

v.

WARNER BROS. PICTURES, INC., Defendant.

United States District Court
S. D. New York.
Sept. 6, 1960.

Vladeck & Elias, New York City, and Van Arkel & Kaiser, Washington, D. C., for plaintiff; Stephen C. Vladeck, Judith P. Valdeck, David L. Bernstein, New York City, Henry Kaiser and Eugene Gressman, of the District of Columbia Bar, Washington, D. C., of counsel.

Proskauer, Rose, Goetz & Mendelsohn, and Howard Levinson, New York City, for defendant; Burton A. Zorn, Marvin E. Frankel, Martin J. Oppenheimer, Ira H. Lustgarten and Saul G. Kramer, New York City, of counsel.

HERLANDS, District Judge.

Plaintiff's motion for a preliminary injunction and defendant's cross-motion to dismiss the complaint present novel and important questions in the field of labor law.

The primary question concerns the extent to which a labor union (the plaintiff, hereinafter referred to as "Federation") can effectively assert a contract claim against the employer (the defendant) and negotiate with the employer *after* the expiration of their collective bargaining agreement and *after* the union has been superseded by another duly certified bargaining representative (The Musicians Guild of America, hereinafter referred to as the "Guild").

The controversy originates out of a provision—contained in a number of basic collective bargaining agreements between plaintiff and defendant, the last expiring on February 19, 1958—by the literal terms of which plaintiff had the right in perpetuity to require defendant to negotiate with plaintiff concerning the terms and conditions on which plaintiff might give its written consent to defendant's use on television of the music sound tracks made for theatrical movies produced at any time prior and up to February 19, 1958.

Because the provision is the crux of the case, it is set forth in full as follows (Exhibit A annexed to the complaint, p. 4):

> "The Producer agrees that he will not, without the prior written consent of the Federation, license, lease, lend, give, sell, utilize, or in any other way whatsoever authorize the use, in whole or in part, of the music sound track containing the recorded music made by members of the Federation, or scenes or shots containing pictures of members of the Federation performing on musical instruments or conducting, heretofore made or which will be made prior to the expiration of this agreement, on or in connection with television, during the life of this agreement and thereafter; except only after separate negotiations are entered upon and after a separate written agreement has been reached between the Federation and the Pro-

ducer with respect to the use of such music sound track or such scenes or shots on or in connection with television, can such use be made, and then only upon the terms and conditions agreed upon by the Federation and the Producer in such separate agreement."

The key words are "and thereafter." The provision is part of a detailed contract article entitled "Sound Track Regulations".

In 1960—more than two years after the last agreement between plaintiff and defendant expired—defendant entered into negotiations with Creative Telefilms and Artists, Ltd. to distribute for television use its movie feature films produced in the period prior to 1958 and the music sound tracks for those films. The proposed transaction (involving an $11 million contract) became a matter of public knowledge in June 1960. This triggered correspondence between plaintiff and defendant.

Plaintiff asserted its claim that its written consent was required by defendant and that it expected defendant to negotiate with it (Exhibit 2 annexed to the Kenin affidavit, sworn to August 11, 1960). Defendant repudiated plaintiff's asserted claim (Exhibit 3 annexed to said Kenin affidavit).

Plaintiff's complaint was filed on August 15, 1960. Its motion for a preliminary injunction was filed on August 18, 1960; made returnable August 23rd; and adjourned to August 30th when it was argued.

Under the basic collective bargaining agreements between plaintiff and defendant, defendant was required to enter into exclusive personal service contracts with not less than a certain number of recording musicians. The form of personal service contract ("Motion Picture Production Recording Musicians Personal Service Contract") was attached to the collective bargaining agreement. The personal service contract form contained two provisions relating to the use of music sound tracks on television. One provision was virtually identical with the above-quoted provision and read as follows (Exhibit A annexed to the complaint, p. 22):

"The Producer agrees that he will not, without the prior written consent of the Federation, license, lease, lend, give, sell, utilize, or in any other way whatsoever authorize the use, in whole or in part, of the music sound track containing the recorded music made by the Employee, or scenes or shots containing pictures of the Employee performing on musical instruments or conducting, heretofore made or which will be made prior to the expiration of this agreement, on or in connection with television, during the life of this agreement and thereafter; except only after separate negotiations are entered upon and after a separate written agreement has been reached between the Federation and the Producer with respect to the use of such music sound track or such scenes or shots, on or in connection with television, can such use be made, and then only upon the terms and conditions agreed upon by the Federation and the Producer in such separate agreement."

The other provision in the form of personal service contract irrevocably authorized plaintiff to act on behalf of the musicians with respect to their rights under the basic collective agreement and the personal service contracts. That provision read as follows (Exhibit A annexed to the complaint, p. 23):

"In consideration of the common interests of all the members of the A. F. of M. in the terms and conditions of this personal service contract and the basic agreement between the Producer and the A. F. of M., incorporated herein, the Employee authorizes the A. F. of M. exclusively and irrevocably to take any and all steps and proceedings in its name and behalf and/or the employee's behalf and/or in behalf of any of its members for the enforcement of all rights under this

contract and/or the said basic agreement, all of which rights of the Employee are hereby assigned to the A. F. of M., and said A. F. of M., in behalf of any of its members is irrevocably authorized to agree to any change, modification and/or substitution of any or all of the provisions of this contract and/or the said basic agreement, except that nothing herein contained shall deprive the Employee of any money compensation agreed to be paid to such Employee for services in connection with the making of such motion picture and sound track."

Plaintiff's last basic agreement with defendant terminated on February 19, 1958. On March 31, 1958, the Guild petitioned the N.L.R.B. for an election. On June 13, 1958, plaintiff, defendant and the Guild entered into an agreement for a consent election. (Exhibit A annexed to the Boren affidavit sworn to August 19, 1960). On July 22, 1958, the N.L.R.B. certified the Guild as the exclusive bargaining representative for defendant's musicians. (Exhibit B annexed to the said Boren affidavit).

Since July 22, 1958 the Guild has been the certified representative of defendant's musicians. Defendant and the Guild entered into a basic collective bargaining agreement for the period from September 3, 1958 to December 3, 1961 (Exhibit C annexed to the Boren affidavit, sworn to August 19, 1960). The September 3, 1958 agreement with the Guild does not contain a definitive provision concerning the terms and conditions under which defendant may sell or distribute for television use its music sound tracks recorded prior to September 3, 1958. Instead, a letter dated September 3, 1958, executed simultaneously with the basic collective bargaining agreement, contains a statement of the respective positions of defendant and the Guild, as follows (Exhibit D annexed to the Boren affidavit, sworn to August 19, 1960):

"It is your (defendant's) position that as to all music sound track recorded prior to the effective date of said Basic Agreement (September 3, 1958) you have the unrestricted right to use the same for any purpose.

"It is our (Guild's) position that the individual musicians employed by you prior to February 9, 1958 (sic) under the terms of agreements heretofore entered into by you with the American Federation of Musicians presently have certain legal and/or equitable property rights in and to all music sound track recorded under the terms of such agreements."

Under date of June 22, 1960, the Guild advised defendant in writing (Exhibit B annexed to the Kalmenson affidavit, sworn to August 22, 1960) as follows:

"This letter is written on behalf of the Musicians Guild of America and its members.

"We are advised that members of the Association of Motion Picture Producers presently are engaged in negotiating for licensing of feature motion pictures originally produced for theatrical exhibition subsequent to 1948.

"As you know the Guild represents substantially all of the musicians who were employed in the original production of said feature motion pictures and who reserved all rights on their behalf in connection with the licensing of said feature motion pictures for television.

"On their behalf the Guild hereby requests each of you to negotiate with it the terms and conditions of releasing any of said pictures by you for television exhibition prior to your entering into any agreements therefor and pending the conclusions of said negotiations to refrain from licensing said feature motion pictures for television exhibition.

"We shall appreciate your reply at the earliest possible convenience."

The Guild has not been made or brought in as a party to this litigation

nor has it intervened. It is not before the court in any capacity.

Pursuant to plaintiff's petition of April 18, 1960 (Exhibit E annexed to the Boren affidavit), the N.L.R.B. has ordered an election to be held on September 7, 1960 (Exhibit F annexed to the Boren affidavit).

The court is not called upon to determine the rights, if any, of the individual musicians or of the Guild with respect to defendant's distribution of pre-February 19, 1958 music sound tracks for television under the collective bargaining agreement that expired on February 19, 1958 or under the individual personal service contracts. The issue is whether plaintiff retained the right accorded to it under the expired contract as exclusive bargaining representative after the N.L.R.B. certified that this status had been taken away from plaintiff and given to the Guild.

The reasonable likelihood that the negotiations proposed by plaintiff will lead to a substantial impingement upon the Guild's exclusive representation rights is demonstrated by the aggregate of the following features:

1. Plaintiff seeks to compel defendant to negotiate with it concerning the terms and conditions under which plaintiff may grant its consent to defendant's reuse of music sound tracks.

2. The terms to be negotiated would be those—in plaintiff's judgment—as "would best and most equitably serve the legitimate interests of its members" (Kenin affidavit, sworn to August 11, 1960, p. 2).

3. Plaintiff states that the problems raised by the transfer of musicians' work products from theatrical movies to television involve "manifold considerations of job displacement, of unfair competition, of additional profitable exploitation of the work product of musicians without additional compensation to them, and of other factors affecting the livelihood of all professional musicians" (Kenin affidavit, supra, p. 2). Plaintiff goes on to assert that "For such reasons" plaintiff's

consent to the reuse of music sound tracks was and is deemed important (Kenin affidavit, supra, p. 2).

4. Plaintiff also states that "it will seek payments directly to the original musicians for the reuse of their work product on television" (Kenin affidavit, supra, p. 4).

5. Plaintiff declares that—"as a further condition to its written consent"— it may seek "a promise from the movie producers to halt their growing practice of making new sound tracks abroad, under substandard conditions, and use instead only fairly compensated and protected American musicians" (Kenin affidavit, supra, p. 4).

Plaintiff has thus assumed the role of a collective bargaining representative despite its repudiation by defendant's employees and the election of the Guild.

The subject of reuse payments for musical work product originally created for theatrical movies and potentially available for television is but one link in a complex chain of economic conditions, causes and effects. Interpenetrating factors and relationships are involved.

It would be unrealistic to say that the effect of plaintiff's proposed negotiations on the current collective bargaining relationship between defendant and the Guild would be inconsequentially remote or that the proposed negotiations are completely separate from and independent of the matters within the ambit of defendant's and the Guild's relationship. On the contrary, the impact would be immediate and substantial. The court will not shut its eyes to the plain facts and deal with the question in an intellectual vacuum. "Law addresses itself to actualities." Griffin v. Illinois, 1956, 351 U.S. 12, 23, 76 S.Ct. 585, 592, 100 L.Ed. 891.

What plaintiff seeks is a fragmentation of the collective bargaining process. In this case, fragmentation of the collective bargaining process cannot be effected so as to preclude overlapping activities and rival influences. Plaintiff, having been duly superseded by the Guild, will

not be permitted to project itself into the arena of collective bargaining by invoking a provision in an expired contract that literally forever obligates the defendant-employer to obtain the superseded union's negotiated consent as a condition precedent to defendant's reusing its employees' theatrical movie work product on television.

The tug and strain of collective bargaining over the terms and conditions under which defendant may induce plaintiff to grant its consent to defendant's disposition of its music sound tracks cannot be isolated from other aspects of the subject of compensation and work-product of defendant's present employees. Defendant's employees—now represented by the Guild—include the very musicians in whose behalf and for whose benefit plaintiff proposes to bargain with defendant.

Present compensation for existing work-product—whether payable to the employees directly or to a trust fund for their benefit and regardless when the work-product first came into existence— is the proper concern of a bargaining representative. The Guild, as the certified bargaining representative, has asserted the right to negotiate with defendant concerning that matter.

Despite plaintiff's contrary asseverations, plaintiff would in fact be undertaking here and now the function of a bargaining agent for defendant's current employees were plaintiff permitted to enforce the "thereafter" consent clause. The right being asserted by plaintiff is the right to bargain collectively. As the repudiated representative, plaintiff does not possess that right. Plaintiff is functus officio.

If it be assumed arguendo that plaintiff is not chargeable with a conscious specific desire to usurp Guild's legitimate and protected functions, the situation is fraught with the risk that—regardless of the assumed purity of plaintiff's motives—Guild's activities as the certified bargaining representative would be substantially obstructed. That is the transcendent issue.

During the time when defendant is legally obligated to deal exclusively with Guild, any negotiations between defendant and plaintiff concerning current terms and conditions for the reuse of the work-product of plaintiff's former members who are Guild's present members is bound substantially to burden and obstruct or to tend to burden and obstruct the collective bargaining relationship between defendant and the Guild. The court will not issue an injunction when its reasonably probable effect would be violative of national labor policy.

The elimination of the economic evil of parallel and overlapping claims of rival unions directed against the same employer and involving the same employees was one of the prime objectives of the National Labor Relations Act. 29 U.S.C.A. § 159(a). To achieve that objective the courts have formulated the exclusivity principle, expounded in such cases as N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 44–45, 57 S.Ct. 615, 81 L.Ed. 893; Modine Mfg. Co. v. Grand Lodge Int. Ass'n of Mach., 6 Cir., 1954, 216 F.2d 326, 329; McLeod v. International Longshoremen's Association, D.C.E.D.N.Y.1959, 177 F.Supp. 905, 909. The principle has been applied by the National Labor Relations Board in such cases as American Seating Company and Pattern Makers' Association, 106 N.L.R.B. 250 (1953).

In N. L. R. B. v. Jones & Laughlin Steel Corp., supra, the Supreme Court said, 301 U.S. 44, 57 S.Ct. 627:

"We said that the obligation to treat with the true representative was exclusive and hence imposed the negative duty to treat with no other."

In Modine Mfg. Co. v. Grand Lodge Int. Ass'n of Mach., supra, the Court said 216 F.2d 329:

"Under the National Labor Relations Act and the applicable decisions of the Federal courts, the bargaining contract must be administered by a representative of the employees' own choosing. It is an un-

fair labor practice for an employer to refuse to bargain collectively with the representative of his employees. Section 8(a) (5), Labor Management Relations Act, 29 U.S.C.A. § 158(a) (5). Moreover, the obligation to treat with the representative is exclusive and imposes the 'negative duty to treat with no other.' N. L. R. B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 44, 57 S.Ct. 615, 628, 81 L.Ed. 893. After certification of CIO the employer was compelled to bargain and deal with CIO exclusively. This was true although the employer had bound himself by contract previously to bargain with IAM National Licorice Co. v. N. L. R. B., 309 U.S. 350, 365, 60 S.Ct. 569, 84 L.Ed. 799; J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762.

"Recognition of IAM after the election and certification of CIO would have been unlawful. Since it is established that the bargaining agent can be dispensed with or changed by the employees, it is evident that the contract of 1948 after the election of 1950 had to be administered by CIO. The recognition clause of the agreement of 1948 became inoperative when IAM ceased to be the certified representative of the employees."

In American Seating Company and Pattern Makers' Association, supra, the National Labor Relations Board said (251–252, 255):

"The Respondent's principal agent argument assumes that common-law principles of agency control the relationship of exclusive bargaining representative to employees in an appropriate unit. We think that this assumption is unwarranted and overlooks the unique character of that relationship under the National Labor Relations Act.

"Under the common law, agency is a consensual relationship. On the other hand, the status of exclusive bargaining representative is a special one created and governed by statute. 'Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representative of all the employees in such unit for the purposes of collective bargaining * * *.' A duly selected statutory representative is the representative of a shifting group of employees in an appropriate unit which includes not only those employees who approve such relationship, but also those who disapprove and those who have never had an opportunity to express their choice. Under agency principles, a principal has the power to terminate the authority of his agent at any time. Not so in the case of a statutory bargaining representative. Thus, in its most important aspects the relationship of statutory bargaining representative to employees in an appropriate unit resembles a political rather than a private law relationship. In any event, because of the unique character of the statutory representative, a solution for the problem presented in this case must be sought in the light of that special relationship rather than by the device of pinning labels on the various parties involved and applying without change principles of law evolved to govern entirely different situations. (251–252)

\* \* \* \* \* \*

"If the Respondent's contention is sound, a certified bargaining representative might be deprived of effective statutory power as to the most important subjects of collective bargaining for an unlimited number of years as the result of an agreement negotiated by an unwanted and repudiated bargaining representative. There is no provision in the statute for this kind of emasculated certified bargaining representative." (255) (Footnotes omitted.)

This exclusivity principle means that defendant must live with Guild until they are put asunder by decertification, superseder or some other lawful act. Until then, defendant cannot live with Federation.

Plaintiff relies on Local No. 520, I. L. G. W. U. v. Glendale Manufacturing Co., D.C.W.D.N.C.1959, 179 F.Supp. 222, where plaintiff-Union moved for summary judgment to have an arbitration award enforced. Defendant cross-moved for summary judgment. Summary judgment was granted to plaintiff. The collective bargaining contract therein involved covered the period from October 15, 1955 to September 30, 1958. On October 1, 1958, in a National Labor Relations Board representative election, plaintiff was ousted as bargaining agent of defendant's employees. The following chronology of events shows how the issue arose:

On April 29, 1958, plaintiff-Union, pursuant to a specific provision of the collective bargaining contract, notified defendant that it desired to negotiate concerning a raise in the wage rate, for the reason that the cost of living in the Consumer's Price Index of the United States Department of Labor had increased in excess of five percent and, accordingly, defendant's employees were entitled to such increase. The defendant maintained that that was not the proper time for a reopening of the contract, and refused to meet with plaintiff on that issue. Plaintiff, accordingly, filed a grievance under another provision of the collective bargaining contract; and, when this grievance was not adjusted, both parties agreed to submit the dispute to arbitration.

An arbitrator was selected, and, on June 6, 1958, the arbitrator was notified of the controversy. Thus, the machinery was set up for the accomplishment of the wage increase. The arbitrator set a hearing for September 9, 1958, at which time both parties appeared, presented testimony and submitted argument. On September 24, 1958, the arbitrator handed down his opinion and award.

The arbitrator determined, first, that the Union's request of April 29, 1958 to negotiate a wage increase was timely and proper; and, second, that the Union's grievance was, however, premature for the reason that the parties had not attempted to bargain over such wage increase.

Accordingly, the arbitrator held the issue as to the wage increase in abeyance pending negotiation on the part of the parties to reach an agreement upon such increase; if the parties failed to reach an agreement, the Union could then reassert its grievance seeking a specific wage increase. The parties failed to agree on a date for a meeting at which they would bargain on the wage increase.

Meanwhile, on September 30, 1958, the collective bargaining contract expired and, as indicated, a new union became the certified bargaining agent of defendant's employees.

On November 3, 1958, plaintiff made a formal request for a meeting. The defendant thereupon refused to bargain with plaintiff, claiming that "since the plaintiff was not at the time of the formal request, representing the defendant's employees, that the issue was moot and any act done thereunder would be unenforceable." 179 F.Supp. at page 224.

In rejecting defendant's contention, the Court took the position that "defendant's employees were entitled to this particular wage increase and the fact that the machinery set up for its accomplishment, through no fault of plaintiff, was delayed beyond the time of the expiration of the contract could not be a defense to a right the defendant's employees had through plaintiff as their representative or bargaining agent." 179 F.Supp. at page 225. The Court, therefore, granted summary judgment "approving and confirming said arbitration award and adjudging the defendant to faithfully abide by its provisions and accordingly that defendant be restrained and enjoined from in any manner failing and refusing to abide by the terms of said award." 179 F.Supp. at page 225.

It is thus to be noted that the Local No. 520 case involved the following features not present in the case at bar: (1) the controversy arose during the life of the collective bargaining agreement; (2) the machinery for the accomplishment of the plaintiff-union's demand had been fully set during the life of the contract and substantially all steps had been taken to arbitrate the merits of the dispute during the life of the contract; (3) all of the facts which enabled the fixation of the plaintiff-union's demand as a liquidated sum were "not in any wise in dispute" and had been adduced at hearings conducted during the life of the contract; (4) all of the operative facts giving rise to the plaintiff-union's claim had occurred during the life of the contract; and the claim thus became vested and accrued during the life of the contract.

Another case relied upon by plaintiff is United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. In that case, the collective bargaining agreement covered the period beginning April 5, 1956 and ending April 4, 1957. The agreement contained an arbitration provision. In addition, the agreement provided, *inter alia*, that if an arbitrator determined that an employee had been suspended unjustly or improperly discharged, the company shall reinstate the employee and pay full compensation for the time lost. A group of employees left their jobs in protest against the discharge of another employee. An official of the respondent told them that they had lost their jobs. After the employees had thus been discharged on January 18, 1957, the collective bargaining agreement expired by its terms on April 4, 1957. "The union, however, continued to represent the workers at the plant." 363 U.S. at page 595, 80 S.Ct. at page 1360.

In August 1957, more than four months after the agreement had expired, "by agreement of the parties" (363 U.S. at page 600, 80 S.Ct. at page 1362) there was submitted to an arbitrator the issues whether the discharged employees had been properly discharged; whether the discharged employees should be reinstated; and whether the employees should receive back pay and, if so, in what amount. The hearing was held before the arbitrator on January 3, 1958. On April 10, 1958, the arbitrator made his award.

The arbitrator found that the discharge of the men was not justified; that only a suspension of ten days was warranted; that the employees were entitled to back pay, minus pay for a ten-day suspension and such sums as the employees received from other employment.

The employer refused to comply with the award. The union brought an action for specific performance of the arbitration provisions of the agreement. The district court ordered arbitration and compliance with the award.

Since the award failed to specify the amounts to be deducted from the back pay, the Supreme Court modified the district court's judgment so that the amount due the employees might be definitely determined by arbitration. The district court's judgment was affirmed in all other respects, i. e., there was enforcement of the award which directed reinstatement.

The majority of the Supreme Court (opinion per Mr. Justice Douglas) did not discuss the issue with which we are concerned. The following features of the United Steelworkers case are not present in the case at bar: (1) the rights that were the subject of arbitration had accrued to the employees under the collective bargaining agreement during its term, i. e., the improper discharge had occurred on January 18, 1957, whereas the contract expired on April 4, 1957; (2) after the expiration of the agreement the same union continued to represent the employees; and (3) the submission to the arbitration after the expiration of the agreement occurred "by agreement of the parties."

The case at bar is, therefore, sharply distinguishable from both Local 520 and United Steelworkers.

If the word "thereafter" is given a literal interpretation purporting to vest plaintiff with a right in perpetuity to grant or withhold its consent after negotiating with defendant, the restrictive covenant is unenforceable as violative of the Labor Management Relations Act, as shown above.

■ The word "thereafter" should be given a reasonable interpretation. In the context of the contract in which it was used, the word may reasonably be taken to mean "after the expiration date of the contract so long as Federation represents the employees." It hardly seems reasonable to construe the word in its absolute and unqualified sense as meaning "forever" or "in perpetuity" regardless of Federation's legal relationship to the employees who are the intended ultimate beneficiaries of the provision.

Section 301(c) of the Labor Management Relations Act (29 U.S.C.A. § 185 (c) ) declares that, for the purposes of an action by labor organizations in the United States District Courts, district courts shall be deemed to have jurisdiction of a labor organization "(1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are *engaged in representing or acting for employee members.*" (Emphasis added.)

Similarly, subparagraph (a) of the same section provides that suits for violation of contracts "between an employer and a labor organization *representing employees*" in an industry affecting commerce may be brought in any district court of the United States having jurisdiction of the parties. (Emphasis added). Subparagraph (b) provides that any such labor organization may sue as an entity and "*in behalf of the employees whom it represents.*" (Emphasis added.)

■ The phrases—"representing employee members", "representing employees" and "employees whom it represents"—mean employee members whom the labor organization now represents. The representation must be current and not past.

Plaintiff does not now legally represent the employees herein involved, for they elected the Guild in 1958 as their bargaining representative and rejected plaintiff.

The complaint must, therefore, be dismissed for the reasons that it does not state a claim upon which relief can be granted and that the Court lacks jurisdiction over the subject matter.

In view of the foregoing grounds of decision, it is not necessary for the Court to determine whether the Norris-La-Guardia Act, 29 U.S.C.A. § 101 et seq. applies or whether the "thereafter" provision contravenes the public policy against restraints in perpetuity on alienation of property.

Nothing expressed in this opinion is intended to reflect upon the good faith of the parties or the Guild. The Court is simply deciding a question of law on the basis of a record that, as counsel agree, contains no genuine issue of material fact.

■ There is a reasonable probability that the exercise of the power sought by plaintiff would lead to (1) a disturbance of the discipline and morale of the defendant's employees; (2) an invasion of the fundamental freedom of defendant's employees to choose their bargaining representative; (3) an interference with the bargaining rights presently and actively asserted by the Guild with regard to the very same subject matter; (4) a partial but substantial nullification of the N.L.R.B.'s certification of the Guild as the exclusive bargaining representative of defendant's employees; and (5) a multi-million dollar loss by the defendant.

Weighing the relative hardships and injuries and appraising all the equities, the Court on balance concludes that plaintiff is not entitled to the drastic relief of an injunction.

The plaintiff's motion for a preliminary injunction is denied. The defendant's motion to dismiss the complaint is granted.

This decision and opinion contains the findings of fact and conclusions of law required by F.R.Civ.P. section 52(a), 28 U.S.C.A. If either party deems it necessary or appropriate to propose additional or supplementary findings or conclusions, such submission shall take place within five days from the date hereof, upon due notice to the other side.

This decision and opinion constitutes an order.